UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| INDUS CONCEPTS & ENGINEERING, LLC, a Michigan Limited Liability Company,<br><br>     Plaintiff,<br><br>v.<br><br>SUPERB INDUSTRIES, INC., a Foreign Corporation, and JOHN MILLER, an Individual,<br><br>     Defendants. | Case No. 15-cv-13150<br>Honorable Laurie J. Michelson<br>Magistrate Judge R. Steven Whalen |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS [5]**

Plaintiff Indus Concepts & Engineering, LLC ("Indus") entered a business relationship with Defendant Superb Industries, Inc. ("Superb"), allowing Superb to manufacture and sell products based on Indus' patented LATTICEL EA$^{TM}$ technology. Two agreements governed the parties' relationship. Indus alleges that Superb, and its president John Miller, breached those agreements by secretly charging higher-than-agreed prices, refusing to provide sales and financial records, and otherwise alienating Indus' customer base through its conduct. Alleging that Superb's actions damaged its reputation in the auto industry and ability to procure contracts, Indus filed this lawsuit under Michigan law. Superb has filed a motion to dismiss. For the reasons that follow, the Court will grant in part and deny in part the motion.

# I.  ALLEGATIONS OF THE COMPLAINT

The Court recites as fact the non-conclusory allegations of Indus' Complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Indus is "engaged in the business of providing structural product engineering and innovations to its customers in the North American automotive and structural products industries." (R. 1-3, R. 1-3 at ¶ 6.) Among these products is LATTICELL$^{TM}$ technology, a "portfolio of energy absorbers incorporated into automotive instrument panels, doors, and bumpers" in order to protect occupants in the event of a frontal crash. (*Id.*) Superb is a manufacturer of "precision metal and plastic products and assemblies." (*Id.* at ¶ 7.)

In 2008, Indus and Superb entered into a business relationship. (*Id.* at ¶ 8.) Indus granted Superb the right to manufacture LATTICELL$^{TM}$ products ("Products") and to sell the Products to "certain customers procured by Indus." (*Id.*) The parties put their arrangement into writing in two separate agreements, the Business Alliance Agreement and the License Agreement. (*Id.* at ¶ 9.) While the Agreements were set to expire on March 8, 2013, the parties mutually continued the relationship under the same terms and conditions set forth in the agreements after that time. (*Id.* at ¶ 13.) (Although Defendants attached both documents to their motion to dismiss (R. 5-2, R. 5-3), they are central to Indus' claims and are thus proper for consideration under Rule 12(b)(6), *see Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).)

At the time the parties entered into the agreements, Indus had a sixteen-year relationship with the Chrysler Corporation, which Indus used to secure contracts with two Chrysler suppliers. (R. 1-3, ¶ 15.) One was a two-year contract to provide design and engineering support to Chrysler's direct supplier for its WD truck program, Meridian Lightweight Technologies ("Meridian"). (*Id.* at ¶¶ 16, 17.) Indus introduced Superb as its manufacturing partner for the

2

program, and in 2009, Superb entered into a manufacturing contract with Meridian. (*Id.* at ¶ 16.)

Indus also secured a contract with Chrysler's direct supplier for its Vehicle Product Group, LLC

("VPG") taxi cab program, Triad Services Group ("Triad"). Under that contract, Indus agreed to

provide design and engineering support to Triad from 2006 to 2010. (*Id.* at ¶ 19.) Again, Indus

introduced Superb as its manufacturing partner to Triad. (*Id.*) It also introduced Superb to the

VPG program's other supplier, Select Industries Corporation ("Select"). (*Id.*) In April 2010,

Superb entered into a manufacturing contract with Select to sell the Products for the taxi cab

program under the license from Indus. (*Id.* at ¶ 20.) Based on these relationships and its history

with Chrysler, Indus held the expectation that its Products would continue to be used in

Chrysler's programs, including the DT truck program. (*Id.* at ¶ 18.)

In 2014, Chrysler sought a cost reduction for the Products involved in the WD truck

program. (*Id.* at ¶ 22.) Without such a reduction, Chrysler said, the Products could be eliminated

from the program. (*Id.*) As Indus reviewed the request, it discovered that Superb, and its

president John Miller, had "for a period of approximately five years . . . routinely charged Indus'

customers prices that were substantially higher than those agreed upon by [Indus and Superb]."

(*Id.*) Superb retained approximately $400,000 as a result of the overpricing in the WD truck

program, and "an additional amount as yet undetermined" as a result of overpricing in the VPG

taxi cab program." (*Id.* at ¶ 23.)

The overpricing was done without Indus' knowledge or consent. (*Id.* at ¶ 24.) Superb

concealed its activities by "among other things, selling various Products at the higher price

approved for other Products, sending Indus incorrect sales records, and refusing repeated

requests from Indus to produce copies of certain sales records." (*Id.* at ¶ 25.) When Indus asked

Superb to reduce the pricing for the WD program products to the price the parties had originally agreed upon, Superb refused. (*Id.* at ¶ 26.)

Meridian, aware that the Products might be eliminated from the WD program, asked Indus and Superb to calculate their cancellation charges if the termination came to pass. (*Id.* at ¶ 27.) Indus responded that Superb should bill only for reasonable unrecovered expenses, if any. (*Id.*) But Superb, unilaterally, requested $921,682 from Meridian for "unrecovered capital expenditures" should the program be cancelled. (*Id.* at ¶ 28.) Superb did not seek consent from Indus before submitting this request. (*Id.*) Indus alleges that the charges were "entirely baseless and not properly chargeable to either Meridian or Chrysler." (*Id.*)

A Chrysler engineer informed Indus that due to Superb's attitude and conduct during the program, Chrysler would not select Indus Products for inclusion in the DT truck program. (*Id.* at ¶ 29.) Chrysler also eliminated the Products from the WD truck program. (*Id.*) Finally, Triad stopped working with Indus on any engineering projects, due to the overpricing by Superb in the VPG program. (*Id.* at ¶ 30.) Indus has made "repeated requests" for certain e-mails and sales documents, but Superb has refused to accommodate the requests. (*Id.* at ¶ 31.) Indus asserts that it has incurred substantial damages as a result of Superb's conduct, including Chrysler's early termination of the WD truck program, loss of the potential DT truck contract, and damage to its business relationships with Chrysler, Meridian, Select, and Triad. (*Id.* at ¶ 32.)

Indus filed an eight-count Complaint in a Michigan court on July 30, 2015. (R. 1-3, R. 1-3) Defendants removed the Complaint to this Court on September 3, 2015. (R. 1, Notice of Removal.) Indus asserts breach-of-contract claims as to the Business Agreement and the License Agreement against Superb (Counts I and II), a breach-of-fiduciary-duty claim against Superb (Count III), a claim of unjust enrichment against Superb (Count IV), a claim of fraudulent

misrepresentation against Superb and Miller (Count V), a claim of "innocent/negligent" misrepresentation against Superb and Miller (Count VI), a claim of silent fraud against Superb and Miller (Count VII), and a count of tortious interference with contract/business expectancy against Superb and Miller (Count VIII).

Defendants filed their motion to dismiss (R. 5) in September 2015. The motion is fully briefed and the Court heard oral argument on June 23, 2016.

## II.  LEGAL STANDARD

When a defendant moves to dismiss pursuant to Rule 12(b)(6), the plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), governs. Under that standard, a court first culls legal conclusions from the complaint, leaving only factual allegations to be accepted as true. *Iqbal*, 556 U.S. at 679. The inquiry then becomes whether the remaining assertions of fact "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Although this plausibility threshold is more than a "sheer possibility that a defendant . . . acted unlawfully," it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" his claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

## III. ANALYSIS

Indus seeks to hold Superb liable for its alleged conduct under a variety of contract and tort theories. As will be explained below, the Complaint states a claim for some of these theories and fails to state a claim on others.

### A. Breach of Contract Claims (Counts I and II)

A party claiming breach of contract must establish "(1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach." *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 921 (Mich. Ct. App. 2014).

Additionally, "[a] court should not choose between reasonable interpretations of ambiguous contract provisions when considering a motion to dismiss under Rule 12(b)(6)." *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012). Indeed, under Michigan law,

> The initial question whether contract language is ambiguous is a question of law. If the contract language is clear and unambiguous, its meaning is a question of law. Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact.

*Port Huron Educ. Ass'n, MEA/NEA v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996) (citations omitted). "Courts must not create ambiguity where it does not exist. If the meaning of the language is unclear, the trier of fact must determine the intent of the parties." *Mahnick v. Bell Co.*, 662 N.W.2d 830, 833 (Mich. Ct. App. 2003).

Superb argues that the allegations of the Complaint do not give rise to a finding that any contractual obligations were breached. Instead of addressing Superb's interpretation of the contract, Indus merely argues that Superb's interpretation is "self-serving" and at this stage, the Court "must resolve all ambiguities in the contract in Plaintiff's favor." (R. 12, PID 196.) Indus has not offered its own interpretation of the contract terms at issue. Nor does Indus offer any argument as to why the contract terms at issue are ambiguous. Having studied the relevant contractual provisions, the Court finds that the Complaint states a breach of some, and that amendment is possible as to others.

### 1.  Business Alliance Agreement (BAA)

Superb does not appear to dispute that the BAA was a valid contract and that it covered the time period alleged in the Complaint. However, Superb disputes the scope of the contractual obligations that Indus claims were breached. The Court considers each disputed term in turn.

First, Indus says that it possessed the "exclusive right under Section 1 of the BAA to engage in price negotiations with its customers" and that Superb breached Section 1 "by charging Meridian/Chrysler and Select/VPG prices for the Products that were far in excess of those agreed to by the parties[.]" (R. 1-3 at ¶ 36(a).). Section 1 of the BAA is entitled "Roles and Responsibilities." (R. 10-1, PID 123.) To "Indus," the BAA attributed the following roles and responsibilities:

- Engineering (Design, Analysis, Validation Support)
- Program Management
- PO & Invoicing for Engineering
- *Price negotiation with customer*

(*Id.* (emphasis added).) To "Superb," the BAA attributed the following:

- Product Samples
- Design reviews & recommendations for manufacturability
- Prototype Tooling and Prototype Parts
- Production Tooling and Production Parts
- PPAP preparation . . .
- Quality Management and Shipment Management to Customer's specifications
- PO & Invoicing for Prototype Tooling and Prototype Parts, Production Tooling and Production Parts.
    - Superb to send Indus' portion upon receipt of payment.
- Material (steel, nuts etc) procurement

(*Id.*) The word "exclusive" does not appear in Section 1. But the fact that "Price negotiation with customer" is expressly listed as one of Indus's roles and responsibilities but not one of Superb's suggests that the parties intended Indus to be the one to engage in price negotiations. And Appendix A to the BAA, which provides for "Cost & Profit Sharing," could refer to Superb's

ability to inform Indus of its anticipated manufacturing costs before Indus engaged in negotiations with customers. (*Id.* at 10.) Similarly, Section 7 of the BAA allows Superb to "interfac[e] with Customer for prototype and production tooling and parts, keeping [Indus] fully informed of the status via email." (R. 10-1, PID 125.) But even so, that section could refer to "interfacing" regarding topics other than price negotiations. *See Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (2003) ("[Michigan courts] read contracts as a whole, giving harmonious effect, if possible, to each word and phrase"). Accordingly, the Court finds that it is plausible that Indus had the exclusive right to engage in price negotiations with customers under the BAA and that Superb breached that term by charging prices that were higher than those that were previously agreed upon.

Second, Indus says that Superb "fail[ed] to meet its obligation under Section 2B of the BAA[.]" (R. 1-3 at ¶ 36(b).) That section provides, "In the event that market, program, or product demands change Indus and Superb agree to enter into good faith negotiations to find a mutually satisfactory pricing structure to maintain a competitive position in the market." (BAA at 3.) The Court does not find this provision to be ambiguous: it states that if there is a change in market, program, or product demands, the parties will engage in good-faith negotiations to adjust pricing and stay competitive in the market. And the Complaint does allege some facts to support a breach of this section. First, the Complaint alleges, "In 2014, Indus and Superb learned that Chrysler was seeking a cost reduction in connection with the LATTICELL EA[TM] Products for the WD truck program and that, without such a reduction, the Products could be eliminated from the program." (R. 1-3 at ¶ 22.) Thus, Indus and Superb learned of a change in program demands, which at least arguably triggered the parties' duty to negotiate in good faith. But instead of good-faith negotiations, the following allegedly occurred:

> Indus approached Superb and demanded that Superb reduce the pricing of the LATTICELL EA^{TM} Products for the WD program to the pricing originally agreed upon by Indus and Superb, thereby granting Chrysler a significant price reduction. However, Superb refused to make any reduction in the price of the Products.

(*Id.* at ¶ 26.) The implication is that Superb refused to negotiate the prices in good faith, but that is not stated explicitly. So while the Court is not convinced that Indus has nudged its claim into the category of "plausible," it is likely that Indus could do so in an amended complaint that more fully addresses the aftermath of Chrysler's price reduction request. Accordingly, Indus will be granted leave to amend this claim.

Third, Indus says that Superb breached the BAA by "[f]ailing to pay Indus the full amount of royalties owed for sales made to Meridian/Chrysler and Select/VPG." (R. 1-3 at ¶ 36(c).) Section 5 of the BAA provides, "Payments from Superb to Indus shall be made within (10) days of receipt of payment from the customer as detailed in the License Agreement, Article XI unless otherwise agreed." (BAA at 4.) In turn, the License Agreement provides,

> Within seven (7) days after the end of each calendar month ("Royalty Period"), an accurate statement of Number of Units of License Products sold, *along with any Licensed Product Royalty payments or sublicensing revenues due to Licensor, shall be provided to Licensor, regardless of whether any Licensed Products were sold during the Royalty Period.*

(License Agreement at 3 (emphasis added).) This language notwithstanding, Superb argues that its "obligations to pay Indus were conditioned on its own receipt of payments from the companies' joint customers." (Mot. at 21.)

Superb is correct that Section 1 of the BAA provides that, for sales of "PO & Invoicing for Prototype Tooling and Prototype Parts, Production Tooling and Production Parts," Superb would "send Indus' portion upon receipt of payment[.]" (BAA at 2.) But the Complaint alleges that, despite the parties' agreement to a list of "set prices" for the products (R. 1-3 at ¶ 12), Superb charged "substantially higher prices," collecting approximately $400,000 in the WD

9

truck program and an undetermined amount in the VPG taxi cab program (*Id.* at ¶¶ 22, 23.) Thus, even if, as Superb argues, receipt of customer payments is a "condition precedent" to Superb's payment of royalties to Indus, Indus has alleged that Superb received payments. Although Indus does not allege the amount of the withheld royalties, it could easily remedy this problem through an amended complaint, and the Court will grant Indus leave to do so.

Fourth, Indus says that Superb "[b]reach[ed] its obligation under Section 3 of the BAA to provide Indus with copies of all sale documents and make its business records available for review and verification[.]" (R. 1-3 at ¶ 36(d).) That section provides,

> Superb shall forward copies of documents received from the Customer and Suppliers . . . on a monthly basis. Original copies will be made available to Indus within 10 days of request. Superb shall make its sales records, inventory books, contracts, and other records of its business available to Indus to allow Indus to review, check, and verify the gross revenues as necessary, but not more than twice a calendar year.

(BAA at 3.)

The Court believes Indus has alleged a breach of this contract provision by pleading that Superb "sen[t] incorrect sales records and refus[ed] repeated requests from Indus to produce copies of certain sales records." (R. 1-3 at ¶ 25.) While Superb argues that there are no allegations regarding whether Indus "requested records in the manner required by Section 3" or "how Superb refused to make the records available," these purported omissions are not relevant under the language quote above. That clause is straightforward: it requires Superb to produce business records within 10 days of a request by Indus. It does not list any requirements as to how records requests should be made. To make out a claim for breach of contract at the motion to dismiss stage, it is enough that Indus has pled, "Upon discovering the Defendants' wrongdoing with the pricing of the Products, Indus made repeated demands that Superb produce certain specific emails to Meridian and Select and attached sales documents" but "Superb . . . refused to

10

provide such information and records[.]" (R. 1-3 at ¶ 31.) Because the Court is already granting Indus leave to amend its complaint for other reasons, Indus should consider addressing pleading its breach of Section 3 of the BAA in greater detail.

Finally, Indus alleges that Superb "'[i]mproperly conduct[ed] any business dealings' with Indus' customers in violation of Section 8(A) of the BAA" by charging $921,682.00 to Meridian for unrecovered capital expenditures. (R. 1-3 at ¶ 36(e).) That section provides,

> In consideration of this Business Alliance, Superb absolutely and unconditionally represents and agrees that for a period of three (3) years from the signing of this Agreement or three (3) years after the business alliance is terminated for any reason whatsoever . . . Superb shall not compete with Indus in the North American market for Customer's business related to relationships, projects or products that Indus has developed and shall not directly or indirectly . . . engage in or conduct any business dealings with Customer in North America.

(BAA at 4.) This section of the BAA is titled, "Covenant Not to Compete and Non-Solicitation." (*Id.*)

Given the plain language of the section and its title, it is clear that it does not apply to the conduct alleged in the Complaint. By its terms, this section applies where Superb seeks to "*compete* with Indus in the North American market[.]" (BAA at 4 (emphasis added).) But the conduct alleged in the Complaint arose from the pre-existing, cooperative relationship between Indus, Superb, Chrysler/Meridian, and Select/VPG. (R. 1-3 at ¶¶ 22–23.) None of the allegations in the Complaint suggest that Superb attempted to compete with Indus; rather, the issue is that Superb allegedly abused its relationship with Indus and its business partners for profit. In fact, Indus itself argues in its response that "there is nothing in either contract which speaks" to the unrecovered capital expenditures demand. (Resp. at 15 n.1.) This portion of the breach of the contract claim, therefore, will be dismissed.

11

**2.  License Agreement**

The Court turns next to Indus' claim that Superb breached three clauses of the parties' License Agreement.

Indus first alleges that Superb breached Article III of the License Agreement. That Article provides, "Any manufacturing, selling or promoting activity by the Licensee [Superb] with respect to the property shall be done with the full consent of the Licensor [Indus] and as laid out in the Business Alliance Agreement between the Parties." (License Agreement at 1.) The Court has already found that Section 1 of the BAA is at least plausibly ambiguous and has denied the motion to dismiss that claim on that basis. Thus, the motion will be denied as to the License Agreement as well.

Indus also alleges that Superb "fail[ed] to pay Indus the full amount of royalties owed for sales made to Meridian/Chrysler and Select/VPG" and "fail[ed] to 'keep accurate books of accounts and records covering all transactions' governed by the License Agreement and allow Indus to audit those records at least twice per year[.]" (R. 1-3 at ¶ 41(b), (c).) Because the License Agreement incorporates "APPENDIX A of the Business Alliance Agreement between the parties," the Court grants Indus leave to amend these allegations for the reasons provided regarding Indus' claim that Superb breached the royalties section of the BAA.

**B.  Unjust Enrichment Claim (Count IV)**

Defendants argue that Indus' unjust enrichment claim fails because an enforceable contract governs the same subject matter.

The Court agrees with Superb that the basis of Indus' unjust enrichment claim is also the basis of a breach of contract claim. In particular, as with its contract claim, Indus alleges that Superb has been unjustly enriched because it overpriced the Products sold in the WD Program

and VPG taxi cab program without Indus' knowledge and retained the profits gained from the overpricing. In fact, Indus alleges that Superb breached the BAA by "charging Meridian/Chrysler and Select/VPG prices for the Products that were far in excess of those agreed to by the parties, without the knowledge and/or consent of Indus." (R. 1-3 at ¶ 36(a).) Ultimately, Indus cannot have it both ways. *See AFT Michigan v. Michigan*, 846 N.W.2d 583, 590 (Mich. Ct. App. 2014) (holding that a court "may not imply a contract if the parties have an express contract covering the same subject matter").

At this stage in the proceedings, however, the Court will not dismiss the unjust enrichment claim. "[U]nder Fed. R. Civ. P. 8(e)(2), a party may plead a contract claim and an alternative claim for unjust enrichment." *Hennigan v. Gen. Elec. Co.*, No. 09-11912, 2010 WL 3905770, at *15 (E.D. Mich. Sept. 29, 2010) (citation omitted). While the Court has ruled that the breach of contract claims will survive in part, the fact remains that Superb disputes the contract's applicability to the overpricing allegations. Moreover, the Court has merely held that Indus pled a *plausible* claim under the contract—Indus' ability to recover under a breach of contract theory is not yet clear. In such a scenario, "[a]lternative pleading is particular[ly] appropriate[.]" *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 692 (E.D. Mich. 2012) (citation omitted); *see also Date v. Sony Elecs., Inc.*, No. 07-CV-15474, 2010 WL 3702599, at *12 (E.D. Mich. Sept. 16, 2010) ("Plaintiffs argue, correctly, that they are entitled to plead their claim for unjust enrichment as an alternative to their claims for breach of contract so long as questions of fact exist as to the existence of a claim based on contract." (citing *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)).

### C. Tort Claims (Counts III, V, VI, VII and VIII)

Defendants say that all of Indus' tort claims must fail because they "rest on purported contractual duties rather than independent duties arising outside of the contracts." (Mot. at 6.) They also argue that Indus' allegations fail to state a tort claim.

"Under Michigan law, a defendant acting pursuant to a contract is liable in tort only if he or she 'owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations.'" *Ram Int'l. Inc. v. ADT Security Services, Inc.*, 555 F. App'x. 493, 497 (6th Cir. 2014) (quoting *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460 (Mich. 2004)) *see also Rinaldo's Const. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647 (Mich. 1997) ("[T]he threshold inquiry is whether the plaintiff alleges a violation of a legal duty separate and distinct from the contractual obligation.").[1] "[I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not." *Hart v. Ludwig*, 79 N.W.2d 895, 898 (Mich. 1956) (citation omitted). "This separate and distinct duty 'imposed by law' could arise by operation of a statute or under the basic rule of the common law, which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care[.]" *Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W. 2d 553, 558 (Mich. 2011).

"The danger of allowing contract law to 'drown in a sea of tort' exists . . . where fraud and breach of contract claims are factually indistinguishable." *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 546 (Mich. Ct. App. 1995). In *Visteon Corp. v. VarrocCorp Holding BV*, No. 14-cv-12418, 2015 U.S. Dist. Lexis 41804 (E.D. Mich. Mar. 31, 2015), for example, the parties entered an Asset Purchase Agreement ("APA"). As part of the

---

[1] "Michigan courts have referred to the requirement that a separate and distinct duty exist as the 'economic loss doctrine' when the contract is governed by the Uniform Commercial Code (UCC)." *Mid Am. Sols., LLC v. Merch. Sols. Int'l, Inc.*, No. 1:15-CV-563, 2016 WL 96178, at *2 (W.D. Mich. Jan. 8, 2016) (citation omitted).

14

APA, the defendant made certain representations, including, "To [defendant's] knowledge, no[ne of defendant's companies] has received any written notice of intent to terminate any Material Contract to which [defendant] is a party." *Id.* at *3. When plaintiff later discovered that one of defendant's customers was planning to scale back its contract with defendant, it filed suit, asserting claims for both breach of contract and fraud. *Id.* But because both the breach of contract and the fraud claims were based on allegations that defendant had concealed the breakdown in its relationship with its client, the Court found, "Varroc's fraud claims are 'interwoven' with its breach of contract claims; they relate to Visteon's 'performance of the contract and do not give rise to an independent cause of action in tort.'" *Id.* at *6; *See also Randall S. Miller & Assocs., P.C. v. Pitney Bowes Inc.*, No. 14-14447, 2016 U.S. Dist. LEXIS 41793, *18 (E.D. Mich. Mar. 30, 2016) (agreeing "with Defendants that the decision in *Huron Tool* is 'alive and well'. . . , and that it continues to accurately state the rule of Michigan law that a fraud claim is subject to dismissal if the plaintiff 'fails to allege any wrongdoing by [the] defendant[] independent of [the] defendant['s] breach of contract." (citing *Huron Tool*, 532 N.W.2d at 546)).

Similarly here, the Complaint in this case alleges identical violations for both the breach of contract and the fraud claims. Indus claims that Superb breached the BAA by "Violating Indus' exclusive right under Section 1 of the BAA to engage in price negotiations with its customers by charging Meridian/Chrysler and Select/VPG prices for the Products that were far in excess of those agreed to by the parties, without the knowledge and/or consent of Indus." (R. 1-3 at ¶ 36(a)). In support of the fraudulent misrepresentation claim, Count V, Indus alleges that Superb "repeatedly represented to Indus that: (i) it was charging Indus' customers the agreed prices for the Products, (ii) had not raised the agreed price without the knowledge and/or consent

of Indus, and (iii) had not acted in violation of any of its obligations under the Agreements." (R. 1-3 at ¶ 56.) In support of the negligent misrepresentation claim, Count VI, Indus alleges the same thing, word-for-word. (R. 1-3 at ¶ 56.) In support of the silent fraud claim, Count VII, Indus makes nearly identical allegations:

> [Superb failed to perform its] duty to disclose to Indus that: (i) Superb was charging Indus' customers prices that were far in excess of the agreed prices for the Products, (ii) Superb had raised the agreed prices without the knowledge and/or consent of Indus, and (iii) Superb had violated its obligations under the Agreements in its dealings with Indus' customers.

(R. 1-3 at ¶ 70.)

Where "misrepresentations relate to the breaching party's performance of the contract," they "do not give rise to an independent cause of action in tort." *Huron Tool*, 532 N.W.2d at 546. As in *Visteon*, the purported fraud claims are "interwoven" with the breach of contract claims because they involve identical actions Superb purportedly took in performing its contract duties. Indus claims that Superb had a duty under the contract to refrain from negotiating prices with customers (especially without Indus' knowledge or consent), and also claims that Superb committed fraud by breaching that same duty. *See DBI Investments, LLC v. Blavin*, 617 F. App'x 374, 382 (6th Cir. 2015) (dismissing a Michigan fraud claim where "Plaintiffs' allegations of fraud based on Defendant's representations regarding the dissolution procedure [were] essentially claims of nonperformance of the relevant contract provisions governing that procedure"). There is no difference between the fraud alleged and Superb's purported breach of the contract. Accordingly, the motion to dismiss the fraud claims, Counts V–VII, will be granted.

As to the tortious interference claim, Count VIII, Indus alleges that Superb "took a variety of actions which directly resulted in the termination of" agreements and relationships Indus had with Meridian/Chrysler and Triad/Select/VPG. (R. 1-3 at ¶ 79.) These actions included

16

"[k]nowingly charging Indus' customers prices for the Products that were far in excess of those agreed to by the parties, without the knowledge and/or consent of Indus," "[u]nilaterally requesting $921,682.00 for alleged 'unrecovered capital expenditures' without the knowledge and/or consent of Indus," and "[f]alsely representing the true nature of Superb's dealings with Indus' customers[.]" (*Id.* at ¶¶ 79(a)–(c).) Again, the claim that Superb charged excessive prices for the products without Indus' knowledge is indistinguishable from the contractual claim based on the same facts. To that extent, the tortious interference claim will not survive.

Indus' tortious interference claim based on Superb's unrecovered capital expenditures is different. Indus alleges that Superb "unilaterally requested" $921,682.00 from Meridian, which contributed to Chrysler's decision to discontinue its relationship with Indus and eroded Indus' goodwill in the industry. (R. 1-3 at ¶¶ 28, 29.) Indus did allege that the request violated the non-compete clause of the contract. (R. 1-3 at ¶ 36(e).) But, as stated above, the non-compete clause did not actually cover that conduct. Accordingly, it is plausible that by requesting the unrecovered capital expenditures, Superb violated a tort duty separate and distinct from its contractual duties. So the tortious interference claim will not be dismissed based on the *Hart* doctrine.

That said, the tortious interference claim is subject to dismissal because it is not adequately pled. At the hearing, counsel for Indus clarified that the claim is based on tortious interference with a business relationship (rather than with a contract). To show a tortious interference claim under Michigan law, a plaintiff must allege:

> (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted.

17

*Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003) (quoting *Clark v. W. Shore Hosp.*, 16 F. App'x 421, 430 (6th Cir. 2001)).

As to the third element, a plaintiff "must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984)). "If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 539 (Mich. Ct. App. 2005). An act that is wrongful per se is an "act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. Ct. App. 1992). Otherwise, a plaintiff can demonstrate that the defendant "committed a lawful act with malicious intent[.]" *Badiee*, 695 N.W.2d at 539.

According to Superb, when Meridian asked for a cancellation cost calculation, Indus told Superb to "bill only for reasonable unrecovered capital expenses, if any." (R. 1-3 at ¶ 27.) Superb did bill Chrysler for "unrecovered capital expenses." (*Id.* at ¶ 28.) So these allegations do not amount to an act that was wrongful per se. And Indus does not allege why the $921,682 figure was "baseless and not properly chargeable to either Meridian or Chrysler." (*Id.* at ¶ 28.) Moreover, the Complaint does not allege that Superb acted with "malicious intent" to induce Meridian to end its relationship with Indus, thus transforming a lawful act into an unlawful one.

For these reasons, the motion to dismiss the tortious interference claim will be granted. However, Indus will be granted leave to amend the claim to address the deficiency set forth above.

18

Finally, Indus' breach-of-fiduciary duty claim, Count III, is based on Superb's breach of its alleged duty to perform its contractual obligations with "the highest degree of honesty, integrity, and fidelity" by engaging in overpricing, failing to pay royalties, requesting the unrecovered capital expenditures, denying access to sales and financial records, and "misrepresenting the true nature of its conduct" to Indus. (R. 1-3 at ¶¶ 45–47.) These allegations largely mirror the allegations in the breach of contract claim. (*Compare* R. 1-3 ¶ 36 *with* R. 1-3 ¶ 47.); *Engel Mgmt., Inc. v. Ford Motor Credit Co.*, No. 279868, 2009 WL 348828, at *5 (Mich. Ct. App. Feb. 12, 2009) (dismissing a breach-of-fiduciary-duty claim under the *Hart* doctrine where "All the wrongful acts alleged in plaintiffs' amended complaint arise from defendant's duties under the parties' agreement."). Specifically, both claims are based on allegations that Superb violated Indus' right to engage in price negotiations, failed to pay royalties, and breached its obligation to provide sales and financial records. (*Id.*) These allegations do not demonstrate the violation of a tort duty "separate and distinct" from Superb's contractual duties.

This leaves Indus' allegations regarding the unrecovered capital expenditures. As noted above, Superb's alleged conduct in this regard plausibly violated a duty separate and distinct from a contractual duty. However, Indus has not properly pled a breach-of-fiduciary duty claim based on those allegations.

"A fiduciary relationship arises from the reposing of faith, confidence, and trust, and the reliance of one upon the judgment and advice of another." *Ulrich v. Fed. Land Bank of St. Paul*, 480 N.W.2d 910, 911 (1991). Under Michigan law,

> [A] fiduciary relationship usually arises in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as

19

involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer.

*London v. Glassford*, No. 306251, 2013 WL 85801, at *4 (Mich. Ct. App. Jan. 8, 2013) (citing *In re Estate of Karmey*, 658 N.W.2d 796, 796 (Mich. 2003)). Traditional examples of a fiduciary relationship include "trustees to beneficiaries; guardians to wards; attorneys to clients; and doctors to patients." *Ford Motor Co. v. Ghreiwati Auto*, 945 F. Supp. 2d 851, 865 (E.D. Mich. 2013).

"[W]hether there exists a confidential relationship apart from a well-defined fiduciary category is a question of fact." *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 309 N.W.2d 645, 648 (Mich. Ct. App. 1981). "[T]here is no rule that a specific relationship may never be the basis of fiduciary obligations; rather, courts must look to the actual relationship between the parties." *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1345 (E.D. Mich. 2011); *see also Ford*, 945 F.Supp.2d at 865 (citing *Bero Motors v. Gen. Motors Corp.*, No. 224190, 2001 WL 1167533, at *4 (Mich. Ct. App. Oct. 2, 2001)).

Indus does not point to any particular allegations that would allow the Court to find that a fiduciary relationship existed between the parties. Indus' response brief cites allegations regarding the formation of the parties' relationship and the introduction of Superb as Indus' manufacturing partner, but none of these allege anything more than an ordinary contractual relationship. Courts applying Michigan law have allowed breach-of-fiduciary-duty claims to move forward where contracting parties have exchanged confidential information and the defendant has used the contractual relationship for his own benefit. *See Overholt v. Purina Animal Nutrition LLC*, No. 1:14-CV-1216, 2015 WL 1631855, at *2 (W.D. Mich. Apr. 13, 2015) (finding, on a motion to remand, that there was at least a "colorable" claim for breach of fiduciary duty where plaintiff pled that while "[defendant] was [plaintiff's] Purina sales agent, he

20

actively tried to undermine [plaintiff's] business in favor of his own former Purina distributorship"); *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 633 (E.D. Mich. 2005) (allowing a veterinarian's fiduciary-breach claim to survive against a former consultant where the consultant "had access to confidential information, and he held himself out to be the plaintiff's national sales manager," and also "secretly worked . . . on a line of products competitive to the plaintiff."). But no such allegations have been pled here. The breach-of-fiduciary-duty claim will be dismissed.

## IV. Claims against John Miller

The Court now turns to Indus' claims as against John Miller, Superb's president. To the extent that the Court's earlier "separate and distinct" analysis does not suffice to dispose of the tort claims against Miller, the Court further finds that Indus has not pled sufficient allegations to state a plausible claim against him.

Corporate officers act as agents for the corporation; therefore, "the acts of officers and agents of a corporation, within the scope of their employment, are the acts of the corporation[.]" *See Altobelli v. Hartmann*, No. 150656, — N.W.2d —, 2016 WL 3247615 at *4 (Mich. June 13, 2016) (citing *Attorney General v. Nat'l Cash Register Co.*, 148 N.W. 420, 424 (Mich. 1914). It follows that under Michigan law, corporate officers will not be personally liable in tort "solely for the fact that they are officers." *General Motors LLC v. Autel, US Inc.*, No.14-14864, 2016 WL 1223357, at *7 (E.D. Mich. Mar. 29, 2016); *see Lansing Automakers' Fed. Credit Union v. MCG Portfolio Mgmt. Corp.*, No. 5:89-CV-52, 1991 WL 238974, at *1 (W.D. Mich. Sept. 12, 1991).

Rather, a corporate officer "can only incur personal liability by participating in the wrongful activity. 3A Fletcher Cyc. Corp. § 1137. "Michigan law has long provided that

21

corporate officials may be held personally liable for their individual tortious acts done in the course of business, regardless of whether they were acting for their personal benefit or the corporation's benefit." *Dep't of Agric. v. Appletree Mktg., LLC*, 779 N.W.2d 237, 246 (Mich. 2010); *see also People v. Brown*, 610 N.W.2d 234, 237 (2000); *Warren Tool Co. v. Stephenson*, 161 N.W.2d 133, 148 (Mich. Ct. App. 1968). Similarly, the Restatement on Agency provides, "An agent is subject to liability to a third party harmed by the agent's tortious conduct. Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment." Restatement (Third) Of Agency § 7.01 (cited with approval by *Kheder Homes at Charleston Park, Inc. v. Charleston Park Singh, LLC*, No. 307207, 2014 WL 60326, at *6 (Mich. Ct. App. Jan. 2, 2014)).

Taken together, these principles mean that,

Whether [the corporate officer] acted on his own behalf or on behalf of one of the corporate defendants is legally significant for purposes of determining whether [the corporate officer] was acting as an agent of one of the corporate defendants such that liability could be imposed on a corporate defendant. Whether [the corporate officer] committed fraud does not depend on this factual inquiry—[the corporate officer] could commit and be liable for fraud by acting on either his own behalf or on behalf of one of the corporate defendants.

*Kheder Homes*, 2014 WL 60326, at *7 (citation omitted).

With that said, the Complaint does not contain any specific allegations regarding Miller's conduct. For example, Indus refers, in a general fashion, to "a scheme by Superb and its President, Defendant Miller, to systematically breach the Agreements and defraud Indus," but does not say what Miller himself did to participate in that scheme. (R. 1-3 at ¶ 22.) *See Allen v. Morris Bldg. Co.*, 103 N.W.2d 491, 493 (Mich. 1960) (affirming personal judgment for negligence against the corporate defendant's president where "[t]he proofs show[ed] that he was

the majority stockholder, president, and in control of defendant corporation's activities, and that he personally supervised the operations of which complaint is made herein"). In its current form, the Complaint seeks to hold Miller liable by virtue of his position as a corporate officer, a position that is not supported by Michigan law.

Accordingly, the Court grants Defendants' motion to dismiss as to the claims against John Miller, but Indus is once again granted leave to address the deficiencies set forth above.

## V.  CONCLUSION

For the reasons set forth above, IT IS ORDERED that Defendants' Motion to Dismiss (R. 5) is GRANTED IN PART AND DENIED IN PART. Counts III, V, VI, VII and VIII are DISMISSED as to Superb. Count I and II are DISMISSED IN PART as to the non-compete clause.

IT IS FURTHER ORDERED that Indus shall be granted 21 days (August 10, 2016) to file an amended complaint addressing the deficiencies set forth as to Counts I and II, as well as Counts III, V, VI, VII and VIII as against John Miller only.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  July 20, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 20, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

23