UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| INDUS CONCEPTS & ENGINEERING, LLC, <br><br> Plaintiff/Counter-Defendant, <br><br> v. <br><br> SUPERB INDUSTRIES, INC., and JOHN MILLER, <br><br> Defendants/Counter-Plaintiffs. | Case No. 15-13150 <br> Honorable Laurie J. Michelson <br> Magistrate Judge R. Steven Whalen |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [53] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS [52]**

Indus Concepts and Engineering, LLC and Superb Industries, Inc. worked together for many years on the design and manufacture of metal knee brackets made to protect drivers during car accidents. Indus engineered the bracket technology and Superb manufactured the brackets. The parties successfully partnered with Chrysler to utilize the technology in certain Chrysler trucks. Chrysler ultimately cancelled the program, however, and opted for a different technology (knee air bags). Each side now alleges the other breached the contracts governing their business relationship. And each side moved for summary judgment on the others' claims. The contracts, unfortunately, are not models of clarity. But each side has presented an interpretation that is supported by the record.

So for the reasons that follow, the Court will grant in part and deny in part Superb's motion for summary judgment, and deny Indus' motion for summary judgment on Superb's counterclaims.

## I.

### A.

Indus is a Michigan engineering company run by Mani Ayyakannu. (R. 53-6, PageID.970.) Among other things, Indus developed and designed energy-absorbing metal brackets that can be installed in automobiles to protect occupants during a frontal crash. (R. 56-2, PageID.2504.) The brackets came in different thicknesses—2.0, 1.8, and 1.4 mm. (R. 53-6, PageID.971.)

Superb is an Ohio company in the business of manufacturing precision metal products. (R. 53-2, PageID.826.) Its president is John Miller. (R. 54-3, PageID.1674.)

The parties entered into a business relationship in which Superb would manufacture and sell products utilizing Indus' technology. In 2008, Mani (on behalf of Indus) and Miller (on behalf of Superb) signed two agreements to govern their relationship—a Business Alliance Agreement (BAA) and a License Agreement. (R. 53-2, PageID.825–855.) A chart attached to the BAA explained how Indus and Superb would share profits. (PageID.826.) According to the chart, Indus would receive a royalty of $0.20 per piece, regardless of the bracket's size or material. (PageID.837.)

Indus began to work with Chrysler on a program that would incorporate the bracket technology in some of Chrysler's trucks. (R. 56-2.) Indus and Superb worked with Chrysler's direct supplier, Meridian Lightweight Technologies, to provide design and engineering support. (R. 56-2.) While the Chrysler program was getting off the ground, Indus and Superb negotiated pricing on the different sized brackets. (R. 53-6, PageID.984.) According to Indus, under the last

quote it finalized with Superb, Superb would charge Meridian $2.158 for each 2.0 mm part, $2.066 for each 1.8 mm part, and $1.889 for each 1.4 mm part (the 2008 Quote). (R. 56-2, PageID.2507–08; R. 53-6, PageID.997.) Once the program was up and running, Indus passed communication with Meridian off to Superb. (R. 53-6, PageID.990.)

Meridian submitted its first large purchase order for brackets on September 8, 2009. (R 53-13, PageID.1127.) The purchase order included the part numbers corresponding to the 1.8 mm and 1.4 mm brackets and listed the price per piece as $2.158 and $2.066, respectively. (*Id.*; R. 53-6, PageID.988.) But these prices corresponded to the 2.0 mm and 1.8 mm parts in the 2008 Quote. (R. 53-13, PageID.1127; R. 53-6, PageID.994; R. 53-35, PageID.1533.)

Superb emailed Indus the purchase order and also included Indus on an email to Meridian acknowledging the purchase order and informing Meridian that Superb would review the purchase order and let Meridian know if there were any questions or concerns. (R. 53-13, PageID.1125.) Indus did not respond to the email or otherwise object to the purchase order. (R. 53-6, PageID.994, 997.) In other words, Indus did not question why the prices negotiated for the 2.0 mm and 1.8 mm brackets were now being applied to the 1.8 mm and 1.4 mm brackets. According to Superb, it still took a few months to finalize the design with Chrysler, so Superb did not go into production on the order until December 2009. (R. 54-3, PageID.1793–94; R. 53-14.) Beginning in January 2010, Indus received monthly royalty statements. (R. 53-6, PageID.991; R. 53-3.)

During this time, Indus made some attempts to generate interest in the bracket technology from other automakers. (R. 54-6, PageID.2158–2166.) But Indus was unable to generate any programs with them. (R. 54-3, PageID.1704.)

In 2014, Indus learned that its program with Chrysler may be in jeopardy and that Chrysler may opt for a different technology—the knee airbag. (R. 53-6, PageID.999–1000.) In an attempt

3

to save its program, Indus emailed Superb asking if there was any way to lower the cost of the bracket. (R. 53-6, PageID.1001–1002.) Superb responded that it could take an eight-cent cut per bracket if Indus did the same. (R. 53-6, PageID.1002.) Superb and Indus never agreed upon a lower price and Chrysler ultimately cancelled the program. (R. 53-6, PageID.1012.)

In the aftermath, Indus went through the financial paperwork from the program and finally realized that Superb had charged Meridian the 2008 Quote prices for 2.0 and 1.8-sized brackets for the 1.8 and 1.4-sized brackets. (R. 53-6, PageID.1000.) In other words, Superb charged Meridian more for the 1.8 and 1.4 mm brackets than quoted in 2008. Indus maintains that prior to its post-program audit, it believed that the pricing was in accord with the 2008 Quote. (R. 53-6, PageID.996.)

Superb invested more than $1.9 million to obtain the manufacturing capacity it thought necessary to meet the demands that would result from Indus' marketing of the brackets. (R. 54-4, PageID.1884–1889.) But because Indus was not able to secure a relationship with any automaker other than Chrysler, production fell far short of expectations. (R. 54-4, PageID.1885, 2003.)

**B.**

Indus filed the present lawsuit asserting four breach-of-contract claims against Superb. (R. 32.) First, it asserts that Superb breached the License Agreement by failing to obtain Indus' consent to the bracket price in the September 2009 purchase order. Second, Indus asserts that, in contravention of the BAA, Superb failed to negotiate in good faith to lower the bracket price once the program with Chrysler was in jeopardy. Third, Indus asserts that Superb's bracket "overcharging" should be considered a "cost savings" under the BAA, obligating Superb to split the difference with Indus. Lastly, Indus claims that Superb breached its obligation under the auditing provision of the Licensing Agreement because Superb failed to provide Indus with

documentation that would have made it clear that Superb had not followed the letter of the 2008 Quote – i.e., that it was charging $2.158 for the 1.8 mm part and $2.066 for the 1.4 mm part when those were the prices quoted for the 2.0 and 1.8 mm parts. In the alternative, Indus asks for relief under the equitable doctrine of unjust enrichment.

Superb raises two counter-claims, one of which it is still currently pursuing. (R. 33.) Superb asserts that Indus failed to aggressively market the bracket technology to auto manufacturers as was required in their BAA. Because Indus failed to aggressively market the technology, Superb lost profits and did not recoup its investments in building manufacturing capacity. (R. 33, PageID.533.)

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When reviewing a party's motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

## III.

### A.

The Court begins with Superb's motion for summary judgment. (R. 53.)

Superb argues that no reasonable jury could find that it breached in the four ways Indus claims. A party claiming breach of contract must establish "(1) that there was a contract, (2) that

5

the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach." *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 921 (Mich. Ct. App. 2014). "The goal of contract interpretation is to first determine, and then enforce, the intent of the parties based on the plain language of the agreement." *Harbor Park Mkt., Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007).

**1.**

Indus' first breach-of-contract claim is that Superb failed to obtain its consent to the prices Superb charged for the 1.8 and 1.4 mm brackets in the September 2009 purchase order.

The License Agreement, according to Indus, obligated Superb to get Indus' consent on any sale, which includes price approval. In support, Indus points to this line of the License Agreement: "Any manufacturing, selling or promoting activity by the Licensee with respect to the property shall be done with the full consent of the Licensor and as laid out in the [BAA] between the Parties." (PageID.902.)

The Court finds that the plain reading of this provision required Superb, as the Licensee, to have obtained Indus' consent on pricing prior to selling any brackets. And the parties do not appear to dispute this reading. (R. 54-3, PageID.1767 ("Q: Are you [Superb] saying that you understood your obligation under these documents to be that you had to have Indus' approval to the price being charged? A: Yes.").)

But, according to Indus, Superb never obtained Indus' approval for the September 2009 purchase order pricing. As Indus contends: the 2008 Quote was the last pricing it approved, it never approved of using the 2.0/1.8 2008 Quote pricing for the 1.8/1.4 mm parts, and thus, Superb never obtained its consent for the September 2009 purchase order pricing. (R. 56, PageID.2493.) Indeed, says Indus, in the "thousands of emails" and "tens of thousands of documents" produced

in discovery, not one of them communicate Indus' approval for the pricing used in the September 2009 purchase order. (R. 56, PageID.2490–91.) Indus casts this alleged failure to communicate as Superb intentionally concealing its "overcharging." (*See* R. 56.) The Court need not wade into this issue. The dispositive question is whether Superb breached its contractual obligation by failing to obtain Indus' consent on the pricing.

While not entirely clear, Superb appears to assert both that it did not breach the contract and that Indus waived its right to consent to the price. Superb also asserts that Indus cannot establish damages and that its claim is barred by the statute of limitations.

Superb puts forth two arguments for why it did not breach the consent provision. Superb first contends that in a March 2010 telephone call between Mani and Miller, Mani explicitly agreed to the purchase order pricing. (R. 53, PageID.799.) This argument does not warrant summary judgment. Superb does not explain why consent in March 2010—months after the brackets went into production—would comply with the consent requirement in the contract. And more significant, Mani avers that the March 2010 call never occurred. (R. 56-2, PageID.2515–2516.) True, in his deposition, Mani stated that he could not remember whether a meeting occurred in March 2010. (R. 53-6, PageID.986.) But after reviewing emails from around that time, Mani subsequently declared that the call never happened. (R. 56-2, PageID.2513–2515.) Thus, the Court does not believe, as argued by Superb (R. 59, PageID.2814), that Mani's declaration impermissibly contradicted his earlier testimony. Further, Mani maintains that the emails exchanged around that time concerned pricing for future programming, not the current order. (*Id.*) Thus, there is a genuine issue of material fact as to whether there was a March 2010 call in which Mani consented to the pricing on the relevant program.

Next, Superb asserts that, through the exchange of thousands of emails and documents, Indus knew the price Superb was charging for each particular part and never complained about the pricing. More specifically, Mani received the prototypes, he received the purchase order that contained the part numbers and pricing for the 1.8 and 1.4 mm parts, he received documents identifying the size of brackets to be produced, he received monthly royalty statements and reconciliation reports with the pricing information, and he collected these royalties without objection. (R. 53, PageID.799–801; R. 53-6, PageID.989.) So, says Superb, Indus consented to the pricing charged by Superb.

Superb also claims that this same factual basis supports an argument that Indus waived its right under the contract to consent to the pricing. (R. 53, PageID.801.)[1]

Neither argument warrants summary judgment.

With respect to consent, Superb never explains how or why Mani's failure to object to the price along with his collection of royalty fees amounts to consent under the License Agreement. (R. 53, PageID.800–01.) So without any basis for analyzing what the parties intended by "consent," the Court cannot find that Mani's conduct constitutes consent as a matter of law.

For similar reasons, Superb fails to discharge its summary judgment burden on its waiver defense. Unlike forfeiture, which is a failure to make a timely *assertion* of a right, "waiver is a voluntary and intentional abandonment of a known right." *Quality Prod. & Concepts. Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258, 261 (Mich. 2003). "[A] party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original

---

[1] Superb also raised forfeiture and estoppel. But it did so for the first time in its reply brief. Those arguments are thus forfeited. *See Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682–83 (E.D. Mich. 2002) ("[I]t is not the office of a reply brief to raise issues for the first time." (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993))).

contract." *Id*. at 258. But here, the parties' agreements contain anti-waiver provisions (providing that failures in exercising contractual rights did not constitute a waiver of those rights) and provisions that the contracts may only be modified in writing. (R. 53-2). These provisions are relevant because, in alleging that Indus waived its contractual right to consent to pricing, Superb is necessarily asserting that the parties altered the terms of the contract as written. *See City of Grosse Point Park v. Michigan Mun. Liability and Prop. Pool*, 702 N.W.2d 106, 115 n. 11 (Mich. 2005). Thus, the burden of showing waiver is even higher. More specifically, with these provisions present, "[a]ny clear and convincing evidence of conduct [of an intent to waive] must overcome not only the substantive portions of the previous contract allegedly amended, but also the parties' express statements regarding their own ground rules for modification or waiver as reflected in any restrictive amendment clauses." *Quality Prod. & Concepts. Co.*, 666 N.W.2d at 258–59.

Superb has not surmounted this high hurdle. It has not established that Mani's conduct manifested clear and convincing evidence of Indus' intent to waive its right to consent to pricing. Indeed, under Mani's version of events, he was not aware that Superb allegedly failed to obtain, and he failed to provide, consent to the 2009 purchase order pricing. Mani maintains that he believed the 2009 purchase order reflected the 2008 Quote pricing—pricing he had previously consent to. (R. 53-6, PageID.989.) And construing the evidence in the light most favorable to Indus, this assertion seems reasonable. The purchase order specifically listed quote numbers that correspond to the 2008 Quote for the 2.0 and 1.8-sized brackets. And after Mani requested a cost breakdown from Superb in February 2010 for the Chrysler program, Miller provided the pricing for the 2.0 and 1.8-sized brackets. (R. 56-15.) Under Mani's account, his silence and acceptance of royalty payments was not a knowing relinquishment of his right to consent to pricing under the contract. "Because the evidence produced by [Superb] shows nothing more than [Indus'] knowing

9

silence in the face of [the ultimate pricing charged by Superb], the Court finds no basis for concluding that [Indus] waived its right under the [License] Agreement to [consent to this pricing.]" *Superior Commc'n v. City of Riverview*, 230 F. Supp.3d 778, 788–90 (E.D. Mich. 2017), *aff'd*, 881 F.3d 432 (6th Cir. 2018); *see also Quality Products*, 666 N.W.2d at 260. Thus, summary judgment is not warranted on Superb's waiver argument.

Superb also contends that Indus cannot establish damages. First, Superb asserts that it lost money on the bracket program. (R. 53, PageID.807.) But contract damages measure what a non-breaching party lost because of a breach, not what the breaching party gained. *See Rafferty v. Markovitz*, 602 N.W.2d 367, 369–70 (Mich. 1999). So it is of no legal consequence that Superb did not profit from the programs. Indeed, Indus' claim for damages is based upon lost royalties from the termination of the Chrysler program as well as damage to its relationship with the involved auto companies. (*See* R. 32.) Nothing about these allegations necessarily require Superb to have benefitted. So this argument fails.

Second, Superb asserts that the pricing dispute only concerns a program with Chrysler that came to its natural conclusion. (R. 53, PageID.801–02.) Superb says Mani clearly gave Indus' consent to the pricing of the parts used in a second Chrysler program, and it was this second program that was cancelled. Thus, says Superb, Indus has no claim of damages. (*Id.*) But Mani testified that there were not two distinct programs with Chrysler. (R. 56-2, PageID.2509–2511.) From Indus' perspective, the disagreement on pricing that stemmed from the September 2009 purchase order carried through the entirety of its relationship with Chrysler. (*Id.*) Thus, whether the programming with Chrysler should appropriately be seen as one or two programs is a disputed, material fact for trial.

Finally, Superb asserts that Indus' breach of contract claim is barred by Michigan's six year statute of limitations. (R. 53, PageID.820.) Any actions occurring before July 30, 2009 would have been barred. Mich. Comp. Laws § 600.5807(8). But this defense was premised on Indus' earlier claim that Superb breached the agreements by engaging in price negotiation with Meridian/Chrysler. That activity began prior to July 30, 2009. But Indus made clear at the oral argument (and in its briefing) that is was dropping that claim and instead asserting breach based on Superb's failure to obtain Indus' consent to the price used in the September 2009 purchase order. As that purchase order was issued in September 2009, and production began in December 2009, Indus' claim does not run afoul of the statute of limitations.

Summary judgment is not warranted on Indus' first breach of contract claim.

## 2.

Indus' second breach of contract claim has also shifted as this case has progressed. Indus now appears to be claiming that Superb breached the provision in the BAA obligating the parties to share equally in all "cost savings opportunities." (R. 56, PageID.2497.) The provision reads, "In the event that either Superb or Indus identify cost savings opportunities[,] the savings will be equally shared between Superb and Indus; or when appropriate shared equally between Superb, Indus, and the Customer." (R. 53-2.) The provision falls under the section entitled "Commercial Details." (*Id*.) Other provisions within that section include "profit sharing," "pricing," "annual cost down," and "procurement." (*Id*.) Indus asserts that the cost-savings provision obligated Superb to split the "overcharge" with Indus –i.e., the higher 2.0/1.8 prices that were charged for the 1.8/1.4 mm sized parts. According to Indus, the "effect of Superb's overcharging was to increase its revenue by the amount of $0.269 per knee bolster unit" and these excess amounts collected by Superb "are precisely the type of 'savings' envisioned by the parties in Section 2(D) of the BAA."

(R. 56, PageID.2497.) Thus, says Indus, Superb breached the BAA by not paying Indus 50% of the amount of the overcharges.

Superb asserts that "[t]here is nothing in the BAA or License Agreement that even implies Indus gets a share of the price of the part." (R. 59, PageID.2821.) Instead, the "profit sharing" section governed any share of profits, and that section entitled Indus to a flat rate of 20 cents per piece. (R. 53-2, PageID.837.) The Court agrees.

"Under Michigan law, the purpose of contract interpretation is 'to ascertain the intention of the parties.'" *Reardon v. Kelly Servs., Inc.*, 210 F. App'x 456, 458–59 (6th Cir. 2006) (quoting *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005)) (internal quotations omitted). "Whenever possible, the parties' intent is to be discerned from 'the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument.'" *Id.* (quoting *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003). "A contract provision is ambiguous if its language may reasonably be interpreted in two or more ways." *Lomree, Inc. v. Pan Gas Storage, LLC*, 499 F. App'x 417, 422 (6th Cir. 2012).

Here, the unambiguous meaning of the cost-savings provision is to, as it literally states, "equally share[] between Superb and Indus" the amounts from any "identif[ied] cost savings opportunities." This conjures examples of the price of raw materials dropping, developing more efficient packaging or transportation, or some other factor that would lower costs for Indus and Superb.

Indus' interpretation does render the contract ambiguous. It is unreasonable to read the cost-saving provision as requiring that Superb split any additional profit it received from charging a higher price for the brackets. Indeed, that would naturally fit within the "profit sharing" provision. And courts are to construe contracts in a manner that gives effect to every word or

phrase. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003) (internal quotations omitted). In resisting this conclusion, Indus relies on Mani's declaration which states that the cost-savings provision was "designed to ensure" that both companies "would share equally in the benefits or burdens resulting from changes affecting the price or cost of manufacturing the products." (R. 56-2, PageID.2512.) Even if the Court were to consider Mani's declaration to ascertain whether there is ambiguity, *see Reardon*, 210 F. App'x at 462, his statement only confirms the Court's interpretation. Mani's explanation comports with a plain reading of the cost-savings provision, that if something lowered the cost of the bracket, like a decrease in the cost of the metal, that change would be shared by both parties. Indus' interpretation does not render the contract ambiguous. *See The Glidden Co. v. Kisella*, 386 F. App'x 535, 542 (6th Cir. 2010) (applying similar Ohio contract law to find that, since the defendant's interpretation of a contract term was unreasonable, the term was not ambiguous). Because Superb did not breach the "cost savings" provision, this claim fails as a matter of law.

**3.**

The Court deals in short order with Indus' last two breach of contract claims.

Indus' complaint alleged that Superb failed to "negotiate in good faith" to lower the price of the knee brackets when Indus and Superb learned they might lose the contract with Chrysler. Indus also claimed that Superb breached its "audit" obligations by failing to send Indus documentation that would have revealed that Superb was charging for the 1.8 and 1.4 mm parts the 2008 Quote prices for the 2.0 and 1.8 mm parts. Superb's motion for summary judgment clearly included both of these claims. (R. 53, PageID.804–807.) But Indus did not effectively respond. The only mention of Indus' "good faith negotiation" claim comes in a footnote in the fact section. (R. 56, PageID.2488.) And Indus' response brief wholly fails to mention its "audit" claim. Indus

has thus abandoned these claims. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment" (citing *Hicks v. Concorde Career Coll.,* 449 F. App'x 484, 487 (6th Cir. 2011)); *Clark v. City of Dublin,* 178 F. App'x 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim).

And even if Indus' negotiate-in-good-faith and audit claims were not abandoned, no reasonable jury could find for Indus on them. The "good faith negotiation" claim is based on the provision in the BAA stating that "[i]n the event that market, program, or product demands change[,] INDUS and SUPERB agree to enter into good faith negotiations to find a mutually satisfactory pricing structure to maintain a competitive position in the market." And the record is undisputed that when Indus raised concerns about losing the Chrysler program, Superb did engage in negotiations with Indus and offered to reduce the price eight cents per piece, if Indus agreed to do the same. (*Id.*) Indus fails to explain how Superb's conduct amounted to a failure to negotiate in good faith just because Superb would not reduce the price as much as Indus wanted. This claim fails as a matter of law.

The merits of Indus' "audit" claim fare no better. This claim is based on two contract provisions. One is in the BAA and requires Superb to provide Indus with copies of all sale documents and make its business records available for review and verification. The other is in the Licensing Agreement and requires Superb to "keep accurate books of accounts and records covering all transactions" and allow Indus to audit those records at least twice per year. (R. 53-2, PageID.841.) It appears that Indus is claiming Superb breached these provisions by failing to provide a document that would have made clear how Superb was using the 2008 Quote in the

14

September 2009 purchase order. But both parties admit that no such document exists. Further, the record does not establish that Indus suffered any damages from the alleged breach of these two contract provisions.

Summary judgment is warranted on these contract claims.

**4.**

Indus also makes an argument in the alternative—that Superb was unjustly enriched by charging a bracket price that was higher than what Indus approved.

"An equitable claim of unjust enrichment is grounded on the theory that the law will imply a contract to prevent the unjust enrichment of another party." *Landstar Express Am., Inc. v. Nexteer Auto. Corp.*, 900 N.W.2d 650, 657 (Mich. Ct. App. 2017). But a "plaintiff cannot imply a contract with defendants [where] an express contract" exists between the parties "covering the subject matter." *Id*. That is just the case here: Indus and Superb's business relationship was governed by the License Agreement and BAA. And Superb does not contest that. (R. 53, PageID.819.) Neither does Indus. (*See* R. 56, PageID.2498.) Instead, Indus asserts that if its breach of contract claim fails because there is no breach as a matter of law (or some other defense defeats the contract claim), it should be permitted to argue unjust enrichment. (*See id.*) But that is not the law. *See, e.g., Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993), *aff'd*, 47 F.3d 1167 (table), 1995 WL 19379 (6th Cir. 1995) ("If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract. In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract."); *Baumkel v. Scotts Miracle-Gro Co.*, No. 08-14137, 2009 WL 3190477, at *8 (E.D. Mich. Sept. 28, 2009) ("Plaintiff incorrectly argues that if no breach of contract claim has been properly plead, then Plaintiff must

be able to plead the alternative theory of unjust enrichment. The fact that Plaintiff cannot state a claim for breach of contract does not negate the fact that the parties indeed had an express contract for lawn care services.") So Superb is entitled to summary judgment on the unjust enrichment claim.

* * *

In sum, the Court grants Superb's motion for summary judgment with respect to three of the four contract claims, as well as Indus' unjust enrichment claim, and denies the motion with respect to Indus' consent-to-pricing claim.

**B.**

The Court now moves to Indus' motion for summary judgment on Superb's counterclaims. (R. 52.)

Superb raised two counterclaims. First, Superb claims that Indus breached the Licensing Agreement by failing to aggressively market the knee bracket technology. And second, Superb claims that Indus breached the agreement by failing to negotiate pricing. During discovery, Superb's president admitted that Superb had no damages for this latter claim. (R. 52-4, PageID.772.) And at the hearing, Indus clarified that its claim for breach of contract concerned only consent to the pricing and not negotiation of the pricing. Thus, Superb agreed to drop its second claim. So that leaves Superb's aggressive-marketing claim.

The BAA includes introductory recitals that reference Indus' marketing of the bracket technology. They provide that "Indus is aggressively marketing this product (especially the steel version) to various automotive OEMs and their Tier 1 and Tier 2 suppliers ('Customers')" and that "Superb will ensure adequate manufacturing capacity to support Indus' aggressive marketing of

16

the Latticell technology." (R. 53-2, PageID.826.) The BAA also has a substantive provision that one of Indus' "roles and responsibilities" is "Program Management." (R. 53-2, PageID.827.)

Indus' sole argument in seeking summary judgment is that the agreements did not obligate it to aggressively market the bracket technology. (*See* R. 52.) In Indus' view, Superb is trying to turn the language in the introductory recital that Indus would aggressively market the technology into a binding contract term. According to Indus, when the recital language is read in the context of the whole document, the language has "no bearing on the terms of the contract between the parties." (R. 52, PageID.710.)

Superb responds that Indus fails to read the introductory recitals with the rest of the agreement. Specifically, Superb points to the term in the BAA that obligates Indus to perform "Program Management." (R. 54, PageID.1622–23.) Superb points out that, in depositions, both Indus and Superb agreed that "Program Management" included an obligation on the part of Indus to market the technology. (R. 54, PageID.1623.) So in Superb's view, when the "Program Management" term is read in tandem with the "aggressive marketing" language in the recitals, the BAA obligated Indus to aggressively market the bracket technology.

As previously mentioned, "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties." *Shay v. Aldrich*, 790 N.W.2d 629, 637 (Mich. 2010) (citation omitted). "[I]f the language of a contract is unambiguous, it is to be construed according to its plain meaning." *Id*. "In interpreting the contract, a court must 'honor the intent of the parties' by giving meaning to the agreement as written." *Superior Commc'ns v. City of Riverview, Michigan*, 881 F.3d 432, 438 (6th Cir. 2018) (quoting *Rasheed v. Chrysler Corp*., 517 N.W.2d 19, 29 n.28 (Mich. 1994)). "Thus, the contract should be read as a whole, 'giving harmonious effect, if possible, to each word and phrase.'" *Id*. (quoting *Wilkie v. Auto-Owners Ins. Co*., 664 N.W.2d 776, 781 n.11

17

(Mich. 2003). "If the contract's provisions 'may reasonably be understood in different ways,' the contract is ambiguous, and its interpretation is a question of fact for the jury." *Id.*

Viewing the BAA as a whole, the agreement is ambiguous on whether Indus was required to aggressively market the bracket technology. It is not clear, as Superb suggests, that the "aggressive marketing" language in the introductory recitals gives meaning to the "Program Management" term. But it is also not clear, as Indus suggests, that it clearly does not. "Program Management" is a very general term that could be read to mean a host of things: regular communication with current program clients, staying up-to-date on changing technological demands, ensuring future programming (like marketing), to name a few. This contract provision is not clear on its face.

So the Court can turn to extrinsic evidence to determine whether the evidence is so one-sided as to make one party's interpretation unreasonable as a matter of law. *See Lomree, Inc. v. Pan Gas Storage, LLC*, 499 F. App'x 417, 421 (6th Cir. 2012). This is true even when a contract contains an integration clause. *See Omnicom Grp., Inc. v. 880 West Long Lake Assoc.*, 504 F. App'x 487, 492 (6th Cir. 2012). While extrinsic evidence here suggests that the parties *did* agree that Indus would aggressively market the bracket technology, (*See* R. 54-6, PageID.2178), it is less clear that it was the parties' intent that aggressive marketing fall under "Program Management" as an enforceable term of the contract. (*See* R. 54-6, PageID.2175–84.) It will therefore be for a jury to determine the interpretation of "Program Management" "in light of the relevant extrinsic evidence." *Superior Commc'ns*, 881 F.3d at 439; *see Klapp*, 663 N.W.2d at 454; *see also Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008).

## IV.

For the foregoing reasons, the Court will GRANT IN PART AND DENY IN PART Defendant's motion for summary judgment (R. 53), and DENY Plaintiff's motion for summary judgment on Defendant's counterclaims (R. 52).[2]

SO ORDERED.

Dated: July 30, 2018

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 30, 2018.

s/Keisha Jackson
Case Manager

---

[2] Pursuant to the referenced email that Indus has dropped its damages claims for the VPG program (R. 53, PageID.809; R. 53-34) and because parties' briefing does not address the program in anything other than a footnote, (R. 56, PageID.2491), Superb's motion for summary judgment will be granted as to the VPG program.